## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

SERVICE RESTORATION, INC.,                    Case No. 24-cv-938 (LMP/JFD)

                                   Plaintiff,

v.                                         **ORDER ON CROSS MOTIONS FOR**
                                              **SUMMARY JUDGMENT**
EVANSTON INSURANCE
COMPANY,

                                   Defendant.

---

Plaintiff Service Restoration, Inc. alleges that Defendant Evanston Insurance Company's refusal to pay for remediation and rebuilding work completed by Service Restoration constitutes a breach of contract or estoppel under Minnesota common law.[1] *See generally* ECF No. 9. Both parties move for summary judgment. ECF Nos. 34, 40. Evanston's motion for summary judgment on Service Restoration's estoppel claim is granted because Service Restoration has an adequate legal remedy. Because the parties came to an agreement in which Evanston promised to pay for the remediation work, Service Restoration's motion for summary judgment on its breach-of-contract claim is granted.

---

[1]    Service Restoration also brought a claim for quantum meruit but stipulated to the dismissal of that claim on June 24, 2025. ECF No. 48.

## BACKGROUND

On December 16, 2022, a multi-unit residential property (the "Property") owned by Ryan Jutting was damaged by water.  ECF No. 9 ¶ 7; ECF No. 38-4.  Jutting had an insurance policy for the Property from Evanston.  ECF No. 42-2.  On December 16, 2022, Jutting contacted Service Restoration to begin repair work.  ECF No. 38-8 at 33.

## I.    Jutting Hires Service Restoration and Repair Work Begins

Water damage projects progress in two distinct phases: mitigation and rebuild.  ECF No. 38-1 at 38:10–15.  Mitigation generally requires Service Restoration to "extract the water, set the fans," and "do[] all the dry-out process."  *Id.* at 38:5–7.  Rebuild begins upon the completion of mitigation and is the process of putting "the property back together."  *Id.* at 31:15, 38:8–9.

Service Restoration requires an owner to sign separate contracts authorizing each phase of work.  *Id.* at 37:22–38:15.  Accordingly, on December 17, 2022, Jutting entered a contract with Service Restoration to begin mitigation, *see generally* ECF No. 38-6, which is Service Restoration's "standard contract" used on all mitigation projects, ECF No. 38-1 at 37:14–21.  In the contract, Jutting acknowledged that:

> I hereby authorize Service Restoration, Inc. ("Service") to perform labor and services and provide materials to the Property ("Services") to repair, replace and/or restore the Property . . . .
>
> I understand that Service has no connection with my insurance company and/or the insurer for the Property, and that I alone have the authority to authorize Service to perform the services . . . .
>
> Service makes no representations or warranties regarding my insurance coverage, or regarding whether my insurer will pay for all or any of Service's services provided to the Property or me. I agree to pay Service

2

in full for the Services Service provides to me or to the Property, regardless of my insurance coverage. As Owner/Agent of the property, it is understood that I have authorized the work and accept responsibility to [Service Restoration] for services rendered.

ECF No. 38-6 at 2. These contract provisions are critical because Service Restoration must ensure that an owner will pay for the work if insurance does not. ECF No. 38-1 at 119:16–19. In fact, at the time Service Restoration began work on the Property, it did not know whether Evanston would cover the damage. *Id.* at 117:20–22, 119:20–23.

Shortly after Jutting reported the water damage to Evanston, Evanston assigned Kimberly Stokes as the desk adjuster on the claim. ECF No. 38-3 at 95:3-5. Stokes hired Allcat Claims as the independent field adjuster, ECF No. 42-7, who then assigned the project to Alex Pruitt, ECF No. 42-8. Pruitt explained the duties of a field adjuster as "gather[ing] the information for the file, compil[ing] an estimate to submit to [the insurance company] for their review and at the end of the day be the eyes and ears of all information that we're able to see on site." ECF No. 38-2 at 8:3–7. In his capacity as a field adjuster, Pruitt helps the insurance company make its coverage determination, determine the scope and cause of loss, and determine what repairs are necessary. *Id.* at 11:12–12:4. But Pruitt is not involved in "payments" or "determining actual coverage and exclusions." *Id.* at 12:16–17. Instead, Pruitt works on a case until coverage is determined or he is told to "step away." *Id.* at 19:2–7.

Pruitt first spoke with Service Restoration on December 20, 2022. ECF No. 38-8 at 30–31. Service Restoration's notes about this initial discussion indicate that it told Pruitt about its initial mitigation plan, that Pruitt was "in agreement with all of it," and that Pruitt

3

would not appear on site until the initial steps were completed and they could discuss "what needed to take place for rebuild." *Id.* at 31. Pruitt first appeared at the Property on December 29, 2022, to figure out the cause of the loss and learn about Service Restoration's proposed scope of repair. ECF No. 38-2 at 28:12–29:8. Service Restoration walked Pruitt through the Property and explained its initial mitigation efforts and proposed path forward, and Pruitt allegedly agreed with the scope of the proposed work and told Service Restoration to continue with the process. ECF No. 38-1 at 155:10–156:25. Daniel Schmidt, the owner and founder of Service Restoration, *id.* at 22:9–11, acknowledged that Pruitt did not direct Service Restoration through specific mitigation steps nor confirm that Evanston would cover the damage. But Schmidt believed that because Pruitt agreed to Service Restoration's proposal, *id.* at 156:16–157:7, 162:16–21, when Pruitt said to "keep going on it," Service Restoration "took that as approval[]" of coverage, *id.* at 159:8–10. Pruitt, for his part, explained that Service Restoration should have known not to rely on him for work authorization. ECF No. 38-2 at 58:5–8.

Schmidt assumed from that point on that Evanston had approved coverage for the project. *See* ECF No. 38-1 at 20:8–12 ("The adjuster didn't say there was an issue. The adjuster didn't mention there was an issue. So we kept moving forward once we agreed on a scope."). But Schmidt also acknowledged that "[j]ust because the adjuster comes there doesn't mean there's always coverage." *Id.* at 157:17–19. And Stokes explained that,

even well into January 2023, she was still investigating whether coverage was at issue,[2] and had not informed Pruitt nor Service Restoration that there might be a coverage concern. ECF No. 38-3 at 58:16–59:14.

On January 3, 2023, Service Restoration sent Pruitt an initial estimate for the mitigation, and on January 9, 2023, Pruitt followed up and asked for an additional bill. ECF No. 38-8 at 29.  On January 18, 2023, Service Restoration prepared a final invoice for the mitigation portion of the project—made out to Jutting—in the amount of $222,486.45. ECF No. 42-13 at 2.

## II.    The Mitigation Bill Is Negotiated

Service Restoration forwarded a copy of the invoice to Pruitt on January 31, 2023, and Pruitt forwarded it to Stokes.  ECF No. 38-8 at 28; ECF No. 38-9 at 5.  Stokes, in turn, referred the bill to an independent third-party auditor, Suredge, "to look at the invoice and determine whether the work and the cost of work is appropriate for what was done."  ECF No. 38-3 at 70:16–18.  Stokes understood that Suredge would contact Service Restoration directly to discuss the invoice.  *Id.* at 70:25–71:3.

Suredge assigned the case to adjuster Michael Miller.  ECF No. 38-11 at 5.  Miller described his role as auditing the project to "assess the invoice, assess the documentation

---

[2]    Stokes's initial inquiry centered around whether heat had been maintained at the Property.  ECF No. 38-3 at 58:11–59:2.  Eventually, her inquiry turned to whether the Property was vacant at the time of the damage, because there would not be coverage if the Property had been vacant.  *Id.* at 67:14–22.

and determine whether the costs are appropriate for the work completed," and ultimately reach a reasonable dollar amount with the contractor directly.  ECF No. 38-12 at 13:8–14:6.

On March 15, 2023, after having scrutinized the invoice, Miller contacted Service Restoration and highlighted his disputes with the proposed invoice.  ECF No. 38-13 at 6. Over the next hour and a half, Miller and Service Restoration exchanged six emails in which both sides considered what constituted an appropriate price for the mitigation work. *See generally id.*  First, Miller suggested a revised amount of $146,800 (down from the initial invoice of $222,486.45) and told Service Restoration that if it agreed, Miller could "get this invoice processed shortly" and that "final documents will be collected . . . to ensure this payment process is handled timely for you." *Id.*  Service Restoration countered and proposed settling the claim for $184,986.32, stating that its "goal was to come to an agreement with you on this." *Id.* at 4.  Miller agreed that the goal was to "get this one moved towards payment for you as soon as possible" and that he was working "to reach an agreement and get this one paid for you." *Id.*  But he rejected the counterproposal because it included "things the carrier will not agree to," offered a price of $162,400, and expressed his "hope" that the amount was "agreeable" because "[i]f the file goes back to the carrier as a non-agreement" he would "have no ability to get [Service Restoration] paid timely." *Id.*  Miller assured Service Restoration that if it agreed "to move forward at $162,400.00," however, he would send it to his claims director that day, and "once processed, the payment will be sent directly" to Service Restoration.  *Id.*  Service Restoration again rejected Miller's proposal, told Miller that "[t]he carrier has hired you to audit our invoice and come

to an agreement so they don't have to spend the time reviewing it themselves," and offered a revised amount of $176,200.  *Id.*  In response, Miller said:

> I am in agreement to send this one up for the revised amount of $176,200.00.  I will advise my claims director and they will email you shortly requesting any needed documents. Once final paperwork is obtained then the carrier will be able to issue the payment as directed. This final process can happen rather quickly so please be on the lookout for an email coming your way.

*Id.* at 2.

Attached to Miller's final email was the referenced "final paperwork," which consisted of a "current W-9," a "signed contract," and a "revised invoice with the agreement settlement amount."  *Id.*  The "signed contract" Miller attached was titled an "Agreement to Revise Service Invoice" ("Agreement to Revise").  ECF No. 42-15.  The Agreement to Revise, dated March 15, 2023, stated in full that:

> SUREDGE, acting as an independent third-party advisor, has reviewed the available project documentation and the service invoice provided by the above-mentioned service provider.
>
> Conclusion: Based on the IICRC Standard for Professional Water Damage Restoration (ANSI/IICRC S500), both SUREDGE and the above-mentioned service provider [Service Restoration] have agreed that the total sum of $176,200.00 would be considered fair and final compensation for water mitigation services rendered.
>
> Should the above-mentioned insurance carrier [Evanston] agree to the dollar amount as indicated, the service provider agrees to release the insurance carrier and the insured [Jutting] from any and all further financial obligation regarding the water mitigation portion of this claim.

7

*Id.*[3]  Service Restoration quickly responded by signing and returning by email the Agreement to Revise and providing the W-9 and revised invoice.  ECF No. 38-13 at 2.  The Agreement to Revise was never signed by Miller or any employee of Evanston.  ECF No. 42-15.

## III.    Rebuild Work Begins and Insurance Issues Come to Light

The second phase of the project began on January 6, 2023, when Service Restoration sent a rebuild agreement to Jutting.  ECF No. 38-8 at 29.  Service Restoration's general rebuild agreement consists of two separate documents completed in two stages: a "work authorization agreement" followed by a "scope of work authorization agreement."  ECF No. 38-1 at 40:18–41:3, 113:13–20.  The work authorization agreement allows Service Restoration to "[b]egin putting the scope of work together."  *Id.* at 40:23–41:3.  After the scope is finalized, the scope of work authorization agreement explains in detail what the project will entail.  *Id.* at 113:9–20.

Jutting signed the work authorization agreement on January 11, 2023.  ECF No. 42-16 at 2.  That agreement, like the mitigation agreement, stated that:

> [Jutting] authorizes [Service Restoration] to repair, replace and/or restore [Jutting's] Property. . . .
>
> [Service Restoration] will provide [Jutting] with a detailed scope of repairs setting forth the summary of necessary work (the "Scope of Work" or "Estimate" or "Repairs").  [Jutting] agrees that [Service Restoration's]

---

[3]    The ANSI/IICRC citation appears to be a reference to standards set by the Institute of Inspection Cleaning and Restoration Certification ("IICRC"), a member of the American National Standards Institute ("ANSI").  IICRC Standards, Inst. Inspection Cleaning & Restoration Certification, https://iicrc.org/iicrcstandards/ [https://perma.cc/DPX8-DHEZ].

responsibility is limited to the work set forth in the Scope of Work plus any additional work requested by [Jutting] . . . .

[Jutting] understands and acknowledges that [Service Restoration] is a separate legal entity that has no connection with [Jutting's] insurance company or its adjuster, and that [Jutting] alone has the authority to authorize [Service Restoration] to make the repairs contemplated by this Agreement. . . .

[Jutting] agrees that [Jutting] is responsible for paying [Service Restoration] for the entire Contract Amount . . . . Although [Service Restoration] will assist [Jutting] in seeking reimbursement of the costs of the work from [Jutting's] insurer, [Jutting] is responsible for payment to [Service Restoration] of the full Contract Amount.

*Id.*

After the work authorization agreement was signed, Service Restoration worked with the field adjuster to determine the scope of the rebuild. ECF No. 38-1 at 40:23–41:7. On January 24, 2023, Service Restoration sent Pruitt a proposed scope of repair. ECF No. 38-15 at 8. Pruitt responded on February 7, 2023, when—according to Service Restoration's notes—Pruitt told Service Restoration that "we know what will be needed" and "asked [Service Restoration] to start getting the materials acquired." ECF No. 38-15 at 7. Pruitt does not recall the conversation but explained that contractors are often eager to get started and that he informs the contractor that "[i]f you want to start the project, that's your own doing." ECF No. 38-2 at 83:22–84:14.

On February 8, 2023, Service Restoration and Pruitt started a back-and-forth dialogue regarding the proposed scope of work. First, Service Restoration's Senior Estimator Rob Medvec sent Pruitt an email with an "update" on the Property and asked Pruitt whether Jutting's policy had "cover[age] law and ordinance coverage." ECF

No. 38-16 at 7. Pruitt responded that Medvec would need to contact Evanston directly. *Id.* On February 15, 2023, Medvec provided Pruitt with another proposed scope of work and stated that "we are eager for approvals." *Id.* at 6. On February 22, 2023, Medvec sent "additional quotes and invoices we have received." *Id.* at 5. Medvec also told Pruitt that "I can reconfigure my scope if that is what you are wanting." *Id.* On February 24, 2023, Medvec thanked Pruitt "for talking through where this is at with me" and stated that "[w]ith you acknowledging we are good to do so, I will have Chad proceed with electrical rough ins come Monday 3/1," but that Service Restoration would "hold up on progress after that as the next item will be water heating which as stated you need additional approvals on." *Id.*

On February 27, 2023, Medvec sent Pruitt a new scope which included replacing missing electrical wire "likely from the theft/vandalism," and inquired as to whether Pruitt would like to visit the Property again. ECF No. 38-15 at 6. The following day, Medvec asked Pruitt to review the proposed scope and "get back to me" because he still "need[ed] to know how to move forward." *Id.* at 5. On March 2, 2023, Medvec noted that he talked with Pruitt on the phone and that "[w]e discussed the quotes." ECF No. 38-16 at 4. Later that day, Pruitt wrote to Medvec that "we need a better break down on materials and hours for the radiators." *Id.* Medvec responded with minor updates on March 6, 7, and 8, 2023, and asked Pruitt "what else can [I] do to help?" *Id.* at 2–3. On March 16, Medvec sent one final scope of repair. ECF No. 38-16 at 2. The same day, Pruitt and Medvec spoke on the phone, and Pruitt allegedly told Medvec that Evanston was requesting "plumbing and

heating bills for October and November 2022" and "[t]his is what has held up the claim and it will not move any further without that info."[4]  ECF No. 38-15 at 3.

Indeed, Stokes suspected that the Property had been vacant at the time of the water leak; if so, the damage would not be covered under the Policy.  ECF No. 38-3 at 67:14–22. To that end, a week before Pruitt told Service Restoration of the potential coverage issue, Stokes sent Pruitt an email stating that she had reviewed the final mitigation invoice and noticed that it referenced a "vacant unfinished basement."  ECF No. 38-9 at 3.  Pruitt informed Stokes that the entire Property was vacant at the time of damage, and Stokes informed Pruitt that she believed there "may be a potential coverage issue."  *Id.* at 2–3.

Service Restoration stopped all work on the Property after Pruitt informed it on March 16, 2023, that nothing would move forward until Evanston received Jutting's utility bills.  ECF No. 37 ¶ 8.  This was, according to Service Restoration, the first time that it had any inkling that insurance coverage was at issue, and it stopped work because it had learned that Jutting would not be able to pay for the work on his own.  ECF No. 38-1 at 88:1–89:7. At that point, Service Restoration estimated it had incurred $31,746.94 in costs related to the rebuild.  *Id.* at 91:2–20.

On March 21, 2023, Service Restoration and Evanston communicated directly for the first time, when a Service Restoration employee emailed Stokes about whether Evanston was going to pay the revised mitigation invoice as agreed to by Suredge on

---

[4]    Notably, this conversation took place the day after Suredge and Service Restoration came to an agreement on the mitigation bill.

March 15, 2023. ECF No. 42-20 at 7. Stokes responded that Evanston was "continuing to investigate coverage." *Id.* at 6. Evanston eventually concluded that the Property was vacant, denied coverage, and never paid Service Restoration for any part of the mitigation or rebuild process. ECF No. 38-3 at 94:9–14; ECF No. 42-21.

After Service Restoration realized that Evanston was unlikely to pay, and concluded that Jutting could not personally pay, it sought a mechanic's lien on the Property. ECF No. 38-1 at 153:20–25; *see also* ECF No. 38-8 at 6. But Service Restoration "missed the timeline" to perfect the lien. ECF No. 38-1 at 153:25. Service Restoration has never sought recovery from Jutting through a lawsuit or other means, though it "reserve[s] the right to." *Id.* at 143:13–15.

On June 5, 2024, Jutting's mortgage company informed him that it was foreclosing on the Property. ECF No. 50-1 at 10. At the time, Jutting had an outstanding mortgage of $716,167.36. *Id.* On July 29, 2024, the Property sold at a Sheriff's auction for $215,000. *Id.* at 4–5.

## IV.    Procedural Background

On February 22, 2024, Service Restoration sued Evanston in Minnesota state court, asserting claims of breach of contract, quantum meruit, and estoppel. ECF No. 1-1. On March 14, 2024, Evanston removed the case to this Court pursuant to the Court's diversity jurisdiction. ECF No. 1 ¶ 4. Service Restoration filed an amended complaint on March 28, 2024, bringing the same claims. ECF No. 9. On June 24, 2025, the parties filed a stipulation to dismiss Service Restoration's quantum meruit claim, ECF No. 32, which the

Court granted, ECF No. 48.  Both parties now move for summary judgment on the breach-of-contract and estoppel claims.  ECF Nos. 34, 40.

## ANALYSIS

Summary judgment is appropriate where the moving party "shows that there is no genuine dispute as to any material fact and the mov[ing party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Hustvet v. Allina Health Sys*., 910 F.3d 399, 406 (8th Cir. 2018).  "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case." *Amini v. City of Minneapolis*, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248, 252 (1986)).  When considering a motion for summary judgment, "facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (quoting *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009)).  But courts must not "weigh evidence or make credibility determinations." *Sanimax USA, LLC v. City of South St. Paul*, 95 F.4th 551, 558 (8th Cir. 2024) (citation omitted).  "[T]he court's analysis does not change" when considering cross-motions for summary judgment.  *Hanson v. Loparex, Inc.*, 809 F. Supp. 2d 972, 977 (D. Minn. 2011).

## I.    Promissory Estoppel

Service Restoration first asserts that Evanston is liable for the entire amount of the mitigation and rebuilding work under a theory of promissory estoppel.[5]  "The doctrine of promissory estoppel implies a contract in law where none exists in fact."  *City of Geneseo v. Utils. Plus*, 533 F.3d 608, 617 (8th Cir. 2008) (citing *Martens v. Minn. Mining & Mfg. Co.,* 616 N.W.2d 732, 746 (Minn. 2000)).  The claim "requires proof of: (1) a clear and definite promise; (2) the promisor intended to induce reliance and such reliance occurred; and (3) the promise must be enforced to prevent injustice."  *Id.* (citing *Olson v. Synergistic Techs. Bus. Sys., Inc.,* 628 N.W.2d 142, 152 (Minn. 2001)).

But promissory estoppel is "equitable" in nature.  *Reisdorf v. i3, LLC*, 129 F. Supp. 3d 751, 763 (D. Minn. 2015) (citing *Martens*, 616 N.W.2d at 746).  And it is well recognized in Minnesota that "[a] party may not have equitable relief where there is an

---

[5]    Service Restoration frames its estoppel claim as one of "equitable estoppel," ECF No. 36 at 9, while Evanston asserts the claim is one of "promissory estoppel," ECF No. 46 at 20.  The parties never directly address their disconnect.  Nevertheless, the claim is more appropriately treated as one of promissory estoppel.  Equitable estoppel "applies to prevent a party from denying the truth of representations of fact previously made." *City of Geneseo v. Utils. Plus*, 533 F.3d 608, 616 (8th Cir. 2008).  Promissory estoppel applies to prevent a party from reneging on a promise to do something in the future.  *See* 28 Am. Jur. 2d *Estoppel and Waiver* § 51 (May 2025 update).  For that reason, "'[a] claim is more appropriately analyzed under the doctrine of promissory estoppel, not equitable estoppel, where representations upon which the plaintiff allegedly relied are more akin to statements of future intent than past or present fact.'"  *Bracewell v. U.S. Bank Nat'l Ass'n*, 748 F.3d 793, 796 (8th Cir. 2014) (quoting 28 Am. Jur. 2d *Estoppel and Waiver* § 34 (2014)).  Accordingly, when a party seeks to enforce an allegedly forward-looking promise, promissory estoppel applies, and a court may treat the estoppel claim as such.  *Id.* at 796 (looking "beyond the label to the actual nature of the cause of action pleaded" to determine that promissory estoppel governed a cause of action instead of equitable estoppel).

adequate remedy at law available." *ServiceMaster of St. Cloud v. GAB Bus. Servs., Inc.*, 544 N.W.2d 302, 305 (Minn. 1996). Here, Evanston asserts that Service Restoration had two adequate remedies at law—a mechanic's lien and a breach-of-contract claim against Jutting—either of which bars Service Restoration from recovering under an equitable theory against Evanston. ECF No. 46 at 18; ECF No. 54 at 6. Whether a party has an adequate remedy at law is a legal question. *ServiceMaster*, 544 N.W.2d at 305.

### A.    Availability of a Mechanic's Lien

Minnesota's mechanic's lien statute provides that "[w]hoever . . . contributes to the improvement of real estate by performing labor, or furnishing skill, material or machinery . . . shall have a lien upon the improvement, and upon the land on which it is situated." Minn. Stat. § 514.01. Its purpose is to "provide a statutory remedy to protect those who furnish materials or services in the improvement of real property." *Stuge v. Bank of Am., N.A.*, No. 13-cv-1135 (PJS/FLN), 2014 WL 297742, at *2 (D. Minn. Jan. 27, 2014) (citing *S.M. Hentges & Sons, Inc. v. Mensing*, 777 N.W.2d 228, 230 (Minn. 2010)).

Service Restoration and Evanston agree that the mechanic's lien statute is ordinarily an adequate remedy at law that bars a contractor from pursuing equitable relief against any party. ECF No. 46 at 18–20; ECF No. 49 at 10. Indeed, Minnesota courts have plainly stated as much. *See ServiceMaster*, 544 N.W.2d at 306 ("The mechanic's lien statute provides contractors with a sure remedy for getting paid . . . . Should a contractor elect not to seek the protection of the clear and effective method available under the statute, this court will not come to its aid."); *see also Craig Scherber & Assocs., Inc. v. Matt Bullock Contracting Co.*, No. A21-0428, 2022 WL 433240, at *2 (Minn. Ct. App. Feb. 14, 2022)

(holding that because plaintiff had, "based on the mechanic's-lien statute, an adequate legal remedy it chose to forgo, it [was] precluded from seeking the equitable remedy of unjust enrichment").

But Service Restoration argues that the mechanic's lien statute does not constitute an adequate remedy in this specific case because any lien it would have placed on the Property "would have been eliminated" when the Property went through foreclosure in 2024, and Service Restoration would not have received any payment.  ECF No. 49 at 10.

Service Restoration cites no authority holding that the adequacy of a remedy at law is contingent on whether a given plaintiff could have received payment through that remedy.  Instead, for a remedy to be adequate it must only be "practical and efficient." *Munshi v. J-I-T Servs., Inc.*, No. A06-346, 2007 WL 92852, at *2 (Minn. Ct. App. Jan. 16, 2007).  Statutory remedies are presumptively practical and efficient, and if a statute "provides a remedy by appeal or otherwise, such remedy is generally exclusive and will preclude any resort to equity."  *Adelman v. Onischuk*, 135 N.W.2d 670, 678 (Minn. 1965) (citation omitted).  Applying this straightforward rule, Minnesota courts have consistently rejected equitable claims brought by contractors precisely because the mechanic's lien statute provided the contractor with an available remedy at law.  *See, e.g.*, *ServiceMaster*, 544 N.W.2d at 306 ("[L]ien rights were adequate remedies that would bar ServiceMaster's claims for equitable relief."); *Mon–Ray, Inc. v. Granite Re, Inc.*, 677 N.W.2d 434, 440 (Minn. Ct. App. 2004) ("[B]ecause the subcontractors failed to pursue their available legal remedy, we conclude that they cannot now claim that they are entitled to equitable relief."); *Southtown Plumbing, Inc. v. Har–Ned Lumber Co.*, 493 N.W.2d 137, 140 (Minn. Ct.

App. 1992) ("Because [plaintiffs] had a statutory remedy and chose not to enforce it, they cannot make out an equitable claim for unjust enrichment.").  None of these cases contains any discussion about whether a contractor would have been successful in its pursuit of a lien.  Quite to the contrary, each case suggests that a contactor's decision not to attempt collection through the mechanic's lien statute singlehandedly ends the pursuit of equitable claims.

Further, Service Restoration's argument that it can forgo the mechanic's lien process and seek equitable remedies simply because it believes it would not have received payment under the lien process frustrates the very purpose of adequate legal remedy doctrine in the first place.  The entire point of the doctrine is to encourage the use of preferred legal remedies precisely because they are well-established and conclusive.  *See Adelman*, 135 N.W.2d at 678 ("The principle that statutory remedies must be exhausted has been clearly spelled out . . . .").  Service Restoration subjectively believes that it would not have recovered by placing a mechanic's lien on the Property, but it had every obligation to pursue one and find out.  Its decision to forgo that well-established remedy and instead argue, in hindsight, that the remedy was inadequate is unconvincing.  *See Cummins L. Off., P.A. v. Norman Graphic Printing Co.*, 826 F. Supp. 2d 1127, 1132 (D. Minn. 2011) ("[I]t is not simply the *existence* of a statutory remedy that bars [plaintiff's] equitable claims, but also its *failure to avail itself of that remedy*.  Minnesota courts have not hesitated to dismiss equitable claims in such circumstances.").  Because Service Restoration had an adequate legal remedy in the form of a mechanic's lien, Service Restoration is prohibited from pursuing equitable claims against Evanston.

**B.    Breach-of-Contract Claim Against Jutting**

Even if the mechanic's lien statute was not an adequate legal remedy, Service Restoration had a second legal remedy it could have pursued (and still may pursue): a breach-of-contract lawsuit against Jutting, the Property owner.

A plaintiff may not recover under an equitable theory such as promissory estoppel "where there is an express contract . . . with respect to the same subject matter." *Schimmelpfennig v. Gaedke*, 27 N.W.2d 416, 420 (Minn. 1947); *Greuling v. Wells Fargo Home Mortg., Inc.*, 690 N.W.2d 757, 761 (Minn. Ct. App. 2005) ("[A]n express contract covering the same subject matter will preclude the application of promissory estoppel."). Here, the mitigation work and the rebuilding work began under and were governed by contracts, which were both signed by Jutting. *See generally* ECF No. 38-6; ECF No. 42-16 at 2. In both contracts, Service Restoration and Jutting agreed that Jutting would pay for the work even if his insurance policy did not cover the work. ECF No. 38-6 at 2; ECF No. 42-16 at 2. As Service Restoration acknowledges, these contracts allow Service Restoration to bring breach-of-contract claims against Jutting. ECF No. 38-1 at 143:13–15. Indeed, Service Restoration maintains that it still has the right to pursue such a remedy against Jutting, and that it would consider it "depending [on] if this [lawsuit] doesn't work out." *Id.* at 143:15–21.

Service Restoration argues that because Evanston is not a party to those contracts, Evanston may not invoke them as an adequate legal remedy. ECF No. 56 at 6. Minnesota courts have consistently rejected this argument. In *Southtown Plumbing*, for instance, a group of subcontractors attempted to sue the financier of a home construction project. 493

18

N.W.2d at 138.  The subcontractors did not contract with the financier directly; instead, each had contracted with the homeowner.  *Id.* at 139.  After the financier refused to provide the full amount of funds to the homeowner, the homeowner failed to pay the subcontractors. *Id.*  But instead of filing a breach-of-contract claim against the homeowner, the subcontractors brought a claim for unjust enrichment against the financier.  *Id.* at 140.  The Minnesota Court of Appeals rejected that approach, holding that the subcontractors could not assert equitable claims against the financier because they "had a remedy through the use of their mechanics' liens or in a breach of contract suit against" the homeowner.  *Id.* at 140.  Likewise, in *Fieseler Masonry, Inc. v. City of Mabel*, No. A14-0246, 2014 WL 4389093 (Minn. Ct. App. Sept. 8, 2014), Fieseler Masonry contracted with a subcontractor, Exact, to build a wall that was part of a larger project financed by the City of Mabel and contracted by Mabel to Alliance Building Construction Corporation.  *Id.* at *1–2.  After Exact failed to pay Fiesler, Fiesler brought equitable claims against Mabel and Alliance. *Id.* at *2–3.  The Minnesota Court of Appeals held that Fiesler's equitable claims were barred because Fiesler could have brought a breach-of-contract claim directly against Exact.[6]  *Id.* at *4.  Both cases stand for the clear proposition that a defendant may point to a contract to which it is not a party as an adequate legal remedy precluding equitable relief.

---

[6]    The same outcome is found in other non-contractual contexts.  For instance, in *Munshi v. J-I-T Servs., Inc.*, No. A06-346, 2007 WL 92852, at *2 (Minn. Ct. App. Jan. 16, 2007), the Minnesota Court of Appeals rejected an employee's attempt to sue a third-party under equitable theories when the employee had not first pursued a lawsuit directly against the employer that failed to pay him.  Similarly, in *Mon-Ray*, the Minnesota Court of Appeals rejected equitable claims brought by a group of subcontractors against a financier

Service Restoration points to two cases that purportedly conflict with *Fieseler Masonry* and *Southtown Plumbing*. Both are unavailing. First, it is true that in *Hoyt v. Marriott Vacations Worldwide Corp.*, No. 12-cv-3093 (DSD/JJK), 2014 WL 509903 (D. Minn. Feb. 7, 2014), the court held that because the defendants "against whom the claim for unjust enrichment is pleaded" were not parties to a given contract, "the conclusion that the existence of an applicable contract bars an unjust enrichment claim d[id] not apply to [those] defendants." *Id.* at *5 n.8. But *Hoyt* "applie[d] the substantive law of Colorado," *id.* at *2, and therefore has no relevance to this case.

The second case, *Kevin Breyer Concrete, Inc. v. Beutel*, No. A09-1547, 2010 WL 2732384 (Minn. Ct. App. Apr. 13, 2010), is simply unpersuasive. There, the court denied a defendant's attempt to avoid equitable liability by pointing to a contract between the plaintiff and third party, holding that "because [defendant] was not a party to the contracts that allegedly bar equitable relief," the defendant was "not in a position to invoke the rule that [plaintiff's] contract . . . bars equitable relief against him." *Id.* at *4 (citing *Schimmelpfennig*, 27 N.W.2d at 420–21). But *Schimmelpfennig* does not stand for such a proposition. In *Schimmelpfennig*, the Minnesota Supreme Court was not asked whether a defendant can invoke a third-party contract to shield itself from equitable claims. Instead, the Minnesota Supreme Court considered whether a plaintiff may assert a breach-of-contract claim and alternatively assert an equitable claim of quantum meruit against a

---

because the subcontractors could have pursued available statutory remedies and received payment from a directly liable third-party. *See* 677 N.W.2d at 440.

defendant with whom the plaintiff had an express contract. *Schimmelpfennig*, 27 N.W.2d at 420–21. In considering the question, the Minnesota Supreme Court simply acknowledged the general rule that "where there is an express contract, there can be no contract implied in fact or quasi contractual liability with respect to the same subject matter" because "[p]arties to an express contract are entitled to have their rights and obligations with respect to its subject matter determined exclusively by its terms." *Id.* Nothing in *Schimmelpfennig*'s factual background or legal reasoning supports *Breyer Concrete*'s conclusion that only the parties to an express contract can argue that equitable claims are barred by that contract.

Because *Southtown* and *Fiesler* more appropriately embrace the adequate legal remedy rule, the Court finds those cases far more persuasive. Accordingly, the Court holds that a defendant may point to a third-party contract as an adequate remedy at law that bars equitable relief. As Service Restoration had (and continues to have) an adequate remedy at law, either in the form of a mechanic's lien or a breach-of-contract claim against Jutting, the Court grants Evanston's summary judgment motion in part and dismisses Service Restoration's promissory estoppel claim.

## II. Breach-of-Contract Claim Against Evanston

Service Restoration alternatively asserts that even if Evanston did not promise to pay for the project ahead of time, the March 15, 2023 email negotiations between Service Restoration and Suredge resulted in a legally enforceable contract under which Evanston

agreed to pay $176,200 for mitigation work in exchange for Service Restoration's agreement to reduce its invoice.[7]  ECF No. 36 at 14–17.

In Minnesota, a contract is formed by "communication of a specific and definite offer, acceptance of that offer, and consideration." *Wright v. Capella Univ., Inc.*, 378 F. Supp. 3d 760, 773 (D. Minn. 2019) (citing *Pine River State Bank v. Mettille*, 333 N.W.2d 622, 626–27 (Minn. 1983)).  Minnesota follows "the objective theory of contract formation, under which an outward manifestation of assent is determinative, rather than a party's subjective intent." *Asia Pac. Indus. Corp. v. Rainforest Cafe, Inc.*, 380 F.3d 383, 385 (8th Cir. 2004) (quoting *TNT Props., Ltd. v. Tri-Star Devs. LLC*, 677 N.W.2d 94, 102 (Minn. Ct. App. 1994)).  Accordingly, the test for whether a contract has been formed is "an objective one to be judged by the words and actions of the parties and not by their subjective mental intent." *Id.* (quoting *Am. Fed'n of State, Cnty. & Mun. Emps., Council #14 v. City of St. Paul*, 533 N.W.2d 623, 627 (Minn. Ct. App. 1995)).

Viewed objectively, there is no genuine dispute that the email communications between Suredge and Service Restoration resulted in the formation of a contract between the parties.  After reviewing the invoice and its supporting documentation, Suredge contacted Service Restoration to negotiate the invoice on March 15, 2023.  ECF No. 38-13 at 6.  Suredge initially suggested a revised amount of $146,800, and informed Service

---

[7]    Service Restoration's breach-of-contract claim does not seek recovery for work completed during the rebuild phase. ECF No. 36 at 14 ("Service Restoration is entitled to judgment that a valid contract was formed with reference to payment for its mitigation work.").

Restoration that it could "get th[e] invoice processed shortly" and that "[s]hortly after agreement, final documents will be collected . . . to ensure this payment process is handled timely" for Service Restoration. *Id.* Service Restoration countered with a proposal of $184,986.32, and stated that its "goal is to come to an agreement" with Suredge. *Id.* at 4. Suredge responded that "there are things the carrier will not agree to," and instead offered to "revise [the] offer to $162,400.00 *to settle*." *Id.* (emphasis added). Suredge further stated that if Service Restoration agreed "to move forward at $162,400.00," it would forward the agreement to a claims director that day and, "once processed, the payment will be sent directly" to Service Restoration. *Id.* Service Restoration again rejected Miller's proposal, noting that "[t]he carrier has hired [Suredge] to audit [the] invoice and come to an agreement so they don't have to spend the time reviewing it themselves," and offered a revised amount of $176,200. *Id.* at 2–3. In response, Suredge stated that it was "in agreement to send this one up for the revised amount of $176,200." *Id.* at 2. Suredge further stated that once "final paperwork is obtained then the carrier will be able to issue the payment as directed." *Id.* at 2. The final paperwork was attached to a separate email and included a "current W-9," a "signed contract," and a "[r]evised invoice with the agreed settlement amount." *Id.*

The emails show Service Restoration's final offer of $176,200, and Suredge's acceptance of that offer. ECF No. 38-13 at 2. And Suredge repeatedly assured Service Restoration that if it agreed to any of Suredge's proposals, payment from the "carrier" (that is, Evanston) would issue shortly. The expressed objective intent as clearly understood by all parties was that Evanston would pay $176,200 in exchange for Service Restoration's

23

agreement to reduce its initial reimbursement request. This is a textbook example of contract formation: that is, offer, acceptance, and consideration.

Consider the factual similarities to *Asia Pacific Industrial Corp.* There, an individual alleged that Rainforest Cafe had "agreed to pay $1,000,000 as a fee for finding" a franchisee in Asia. *Asia Pac. Indus. Corp.*, 380 F.3d at 385. After the individual made a claim for payment from Rainforest Cafe, the individual asked Rainforest to hear the claim in arbitration. *Id.* In response, Rainforest's general counsel sent the following letter:

> Lyle [Berman] asked me to review this file and to *respond to your request* for an arbitration. *We believe that an arbitration in Minneapolis would be a workable process for resolving this dispute and as such we have turned it over to our counsel*, William Pentelovitch. . . . Please provide me with the name and number of your counsel so we can *discuss the ground rules* for arbitration. I believe it is in all of our interests to keep expenses to a minimum.

*Id.* at 386. Rainforest thereafter fought the individual's effort to compel arbitration, but the Eighth Circuit held that Rainforest agreed to arbitrate the dispute when it sent the letter because the letter "reflects an offer which has been received ('request for an arbitration') and Rainforest's acceptance ('an arbitration in Minneapolis would be . . . workable.')" *Id.* At that moment, a contract was formed because "any reasonable person reading the . . . letter in context would conclude Rainforest . . . had agreed to arbitration and it only remained for the lawyers to sort through the details." *Id.*

Likewise, in *Bissada v. Arkansas Children's Hospital*, 639 F.3d 825 (8th Cir. 2011), the Eighth Circuit found a valid contract based on settlement negotiations that took place over email. There, the hospital had revoked the medical staff privileges of one of its doctors. *Id.* at 827. While the doctor was in the process of appealing the hospital's

24

decision, his counsel and the hospital engaged in email discussions that revolved around "whether [the hospital] would reinstate [the doctor's] privileges in exchange for his immediately resigning." *Id.* at 827–28. In this process, the doctor's counsel stated that he "will agree" to resign if the hospital would sign a settlement agreement. *Id.* at 828. The hospital verbally accepted the proposal, but a written agreement was never signed. *Id.* at 831. On appeal from summary judgment, the doctor argued that his "email containing the draft settlement agreement was not an offer at all, but rather was a suggestion of what his offer would be when he later made it," seizing "on the language in the email that he 'will agree' to the settlement as proof he had not yet agreed." *Id.* at 831. The Eighth Circuit disagreed. It noted that an offer "is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *Id.* (citation omitted). With that framework, counsel's statement that the doctor would "agree to the settlement terms included with his email message" constituted a definite offer. *Id.*

Further, in *Jackson v. Federal Reserve Employee Benefit System*, No. 08-cv-4873 (DSD/FLN), 2009 WL 2982924 (D. Minn. Sept. 14, 2009), a plaintiff sought reinstatement of disability benefits from the Federal Reserve System ("FRS"). *Id.* at *1. Prior to bringing suit, counsel for plaintiff engaged in emailed settlement discussions with FRS. *Id.* After going back and forth on initial offers, FRS stated: "I can settle this for $15,000 . . . [s]ubject to written settlement with confidentiality, non-disparagement, release, no re-employment—all the customary terms." *Id.* Plaintiff's counsel asked FRS to increase the offer, but after FRS denied the request, plaintiff's counsel wrote, "Deal . . . go ahead and

draft the paperwork." *Id.* The parties thereafter exchanged a draft written agreement, and plaintiff's counsel indicated that he agreed to a final draft. *Id.* However, after plaintiff saw the draft agreement for the first time, she "came to the conclusion that she did not want to settle for the lump sum payment." *Id.* FRS thereafter sued to enforce the settlement agreement. In holding that the emails created a valid contract, the court found immaterial that "the parties planned to reduce their agreement to writing" but never did, in fact, reduce the agreement to writing, because "[a] court may enforce a settlement agreement that contemplates the execution of documents at a later time, leaves insubstantial matters for later negotiation and/or that does not expressly resolve ancillary issues." *Id.* at *4 (citations omitted). Because the additional written agreement contemplated by the parties contained nothing more than "vague terms that the parties *clearly anticipated fleshing out* in a written agreement," they were not material terms to which the formation of a contract depended. *Id.* (emphasis added).

As in those cases,[8] the parties here engaged in a series of emailed negotiations in which offers and counteroffers were made, and in which acceptance of material terms was clearly indicated. ECF No. 38-13 at 2–3 (documenting Service Restoration's offer to "drop our invoice . . . to $176,200" and Suredge's response that it is "in agreement to send this

---

[8] After the summary judgment hearing, the Court requested additional briefing from the parties specifically focused on the impact of *Asia Pacific Industrial Corp.*, *Bissada*, and *Jackson*. ECF No. 57. Each side submitted helpful supplemental briefing. *See* ECF Nos. 58, 59.

one up for the revised amount of $176,200.00"). Accordingly, a contract was formed the moment Suredge accepted Service Restoration's final offer.

There is also no genuine dispute that Evanston was bound by Suredge's contract with Service Restoration. Although Suredge is an independent company, Evanston acknowledged at the hearing on the motions for summary judgment that Suredge acted as its agent when Suredge contacted Service Restoration and dealt with it in the review and negotiation of the submitted invoice. In fact, Evanston's summary judgment argument is premised on the assertion that Suredge *did* enter a contract that was binding on Evanston. ECF No. 51 at 23 (arguing that "[t]he terms of the Agreement to Revise Service Invoice controls the parties' agreement, not the negotiations or discussions preceding the signing of the contract"). And it is well established that "[a]n agent can bind a principal through actual authority, either express or implied, and through apparent authority." *Trs. of the Graphic Commc'ns Int'l Union Upper Midwest Loc. 1M Health & Welfare Plan v. Bjorkedal*, 516 F.3d 719, 727 (8th Cir. 2008); *see Kellogg v. Woods*, 720 N.W.2d 845, 853 (Minn. Ct. App. 2006) ("When an agent acts for a disclosed principal and enters a contract with a third party on behalf of the principal, the contract is between the principal and the third party."). Accordingly, the contract between Suredge and Service Restoration is binding on Evanston.

Evanston attacks the validity of the contract in three ways. First, it suggests that no contract was formed because the parties "clearly anticipated the signing of a future agreement." ECF No. 54 at 13–14. But the record suggests otherwise. Indeed, nowhere did Suredge indicate that the offers or acceptance were conditioned on the signing of future

27

documents.  At most, Suredge suggested that "final documents" would need to be collected *after* any agreement.  ECF No. 38-13 at 5 (Suredge stating that "[s]hortly after agreement, final documents will be collected by a member of my team to ensure this payment process is handled timely"); *id.* at 2 (Suredge stating that it is "in agreement" and sending "final paperwork" for Service Restoration to complete).  And even if the parties anticipated the signing of future documents, that fact alone does not prevent the formation of a contract when the offer and acceptance was otherwise clear and contained all material terms. *Jackson*, 2009 WL 2982924, at *4.

Second, Evanston argues that its agreement with Service Restoration was contingent on Evanston concluding that the Property was covered.  And that because Evanston eventually concluded that the Property was not covered, a material condition was not met, and the contract was never executed.  ECF No. 59 at 1–2.  But that purported condition— a final coverage determination by Evanston—was not communicated to Service Restoration.  Suredge instead repeatedly promised that Service Restoration would be paid if it agreed to reduce its invoice.  ECF No. 38-13 at 5 (Suredge promising that the "payment process [would be] handled timely for [Service Restoration]" if Service Restoration agreed to settle); *id.* at 4 (Suredge stating that "the payment will be sent directly to [Service Restoration]" if it agreed to settle); *id.* at 2 (upon reaching an agreement with Service Restoration, Suredge stating that "[o]nce final paperwork is obtained then [Evanston] will be able to issue the payment as directed").  Evanston's alleged unexpressed and subjective intent not to pay *unless* it found coverage is irrelevant.  *Asia Pac. Indus. Corp.*, 380 F.3d at 385 (citation omitted) ("Minnesota follows the objective theory of contract formation,

28

under which an outward manifestation of assent is determinative, rather than a party's subjective intent."). Had Evanston intended to withhold payment until it determined coverage, it could have and should have said so, or it could have called off negotiations entirely.[9] In fact, Evanston first suspected that a coverage issue existed at least a week before Suredge contacted Service Restoration. *See* ECF No. 38-9 at 2 (Stokes informing Pruitt on March 9, 2023, that it suspected a "potential coverage issue"). It was not until March 16, 2023, the day *after* Suredge and Service Restoration came to an agreement, that Service Restoration was informed of the potential coverage issue—the vacancy of the Property. ECF No. 37 ¶ 8; ECF No. 42-15.

Finally, Evanston asserts that even if the email communications could constitute a valid contract, the Court should disregard them under the parol evidence rule because those emails are nothing more than negotiations, and the Agreement to Revise is the final contract. ECF No. 51 at 21–23. Evanston accordingly asks the Court to enforce the Agreement to Revise, under which Evanston is bound to pay nothing. ECF No. 46 at 27 ("The express terms of the agreement contain no promise to pay and, in fact, state that Evanston must agree before any payment is made.").

---

[9] Further, to the extent that Evanston implies that it is well understood that an insurance company's payment is conditioned on a finding of coverage, the same could be said in *any* settlement posture. No defendant has a legal obligation to pay on any claim until it is found liable by a court. That a defendant may nevertheless settle reflects that very risk. That is to say any party can—at any time—agree to pay a sum of money to settle a claim, regardless of whether it has the legal obligation to do so.

The parol evidence rule provides that "when parties reduce their agreement to writing, parol evidence is ordinarily inadmissible to vary, contradict, or alter the written agreement." *Hruska v. Chandler Assocs., Inc.*, 372 N.W.2d 709, 713 (Minn. 1985). It applies "where there is a binding agreement, either completely or partially integrated," *Wildhawk Invs., LLC v. Brava I.P., LLC*, 27 F.4th 587, 594–95 (8th Cir. 2022) (citing Restatement (Second) of Contracts § 215 (Am. L. Inst. 1981)), and, when applicable, "prohibits the admission of extrinsic evidence of prior or contemporaneous oral agreements, or prior written agreements, to explain the meaning of a contract," *Alpha Real Est. Co. of Rochester v. Delta Dental Plan of Minn.*, 664 N.W.2d 303, 312 (Minn. 2003) (citation omitted).

Service Restoration argues that the Agreement to Revise does not implicate the parol evidence rule because the Agreement to Revise is not a valid contract, but instead an invalid "agreement to agree." ECF No. 49 at 17–18. Service Restoration therefore takes the position that because the Agreement to Revise is not a contract, the Court may enforce the contract entered at the conclusion of the email negotiations.

The Court agrees that the Agreement to Revise is not a valid contract but not because it is an invalid "agreement to agree."[10] Instead, the Agreement to Revise is not a binding

---

[10]    Agreements to agree are those where "substantial and necessary terms are left open for future negotiation." *Richie Co., LLP v. Lyndon Ins. Grp., Inc.*, 316 F.3d 758, 761 (8th Cir. 2003) (citing *King v. Dalton Motors, Inc.,* 109 N.W.2d 51, 52–53 (Minn. 1961)). The Agreement to Revise, however, does not leave open substantial terms for future negotiation; it only leaves open whether Evanston would accept the terms in the Agreement to Revise.

contract because it is illusory. That is, it does not require Evanston to do anything. *See CRI, Inc. v. Watson*, 608 F.2d 1137, 1142 (8th Cir. 1979) (citations omitted) (explaining that a contract is illusory when it is "conditioned upon the future happening of an event entirely within [one side's] control"); *Nielsen v. Grain Millers, Inc.*, No. 16-cv-3103 (WMW/TNL), 2017 WL 11569190, at *4 (D. Minn. May 2, 2017) (citing *Anderson v. Backlund*, 199 N.W. 90, 91 (Minn. 1924)) ("An illusory promise is a promise in form that promises nothing.").

A fundamental requirement of contract formation is the exchange of consideration. *Wright*, 378 F. Supp. 3d at 773. "Consideration requires that one party to a transaction voluntarily assume an obligation on the condition of an act or forbearance by the other party." *Med. Staff of Avera Marshall Reg'l Med. Ctr. v. Avera Marshall*, 857 N.W.2d 695, 701 (Minn. 2014) (citation omitted). But an illusory promise that does not commit a party to perform cannot act as consideration. *Grouse v. Grp. Health Plan, Inc.*, 306 N.W.2d 114, 116 (Minn. 1981) (holding that where a party is not "committed to performance," it has not supplied sufficient consideration); *OptumHealth Care Sols., LLC v. Sports Concussion Inst. Glob., Inc.*, No. 18-cv-800 (DSD/BRT), 2020 WL 6364997, at *4 (D. Minn. Oct. 29, 2020) (citation omitted) ("For a contract to be illusory, and therefore without consideration, one party must have no obligations to perform whatsoever."); 3 Williston on Contracts § 7:7 (4th ed., May 2025 update) ("Where an illusory promise is made, that is, a promise merely in form, but in actuality not promising anything, it cannot serve as consideration.").

Here, the Agreement to Revise cannot form a contract between Service Restoration and Evanston because the Agreement to Revise lacks any consideration from Evanston. It

is an entirely one-sided contract, in which Service Restoration purportedly agreed to reduce its invoice amount but in which Evanston only promised to consider that proposed amount and decide whether it "agree[d]." ECF No. 42-15. And only if Evanston agreed would it have any obligation to pay. *Id.* Indeed, that is *precisely* how Evanston itself frames the Agreement to Revise. ECF No. 46 at 27 ("The terms memorialized by the Agreement to Revise Invoice were that Service Restoration would reduce its bill for water mitigation to $176,200, and that Service Restoration would release Evanston *should* Evanston agree to pay."); ECF No. 51 at 23 ("[S]ince any payment was expressly conditioned on Evanston's approval, and Evanston did not approve, the payment terms of the Agreement are not enforceable."). But because Evanston merely reserved the right to accept or reject Service Restoration's proposal, Evanston promised nothing and provided no consideration, so the Agreement to Revise is not an enforceable contract. *In re Estate of Peterson*, 579 N.W.2d 488, 492 (Minn. Ct. App. 1998) (stating that documents which "do not state any consideration" are not valid contracts).[11] The fundamental elements of contract formation are missing here. There is no consideration.

---

[11]    Evanston also suggests that its discretion to pay does not affect the validity of the Agreement to Revise as a contract because it is similar to contracts conditioned on third-party approval, which can be valid. ECF No. 51 at 22; ECF No. 54 at 13. But that argument is unavailing because Evanston acknowledges that Suredge was its agent. It therefore operates as if the Agreement to Revise is between Evanston and Service Restoration. *Kellogg*, 720 N.W.2d at 853 ("When an agent acts for a disclosed principal and enters a contract with a third party on behalf of the principal, the contract is between the principal and the third party."). The discretion to pay is not, as a result, a discretionary act taken or not taken by some third party, but discretion taken or not taken by a party itself.

Because the Agreement to Revise is not a valid contract, it does not implicate the parol evidence rule. Instead, as between Service Restoration and Evanston, the Agreement to Revise is more appropriately viewed as some form of a post-agreement offer: either an offer by Evanston of a new (yet unenforceable) contract or as a modification to the original contract. *See Asia Pac. Indus. Corp.*, 380 F.3d at 386–87 (reasoning that a party's proposed modification to the arbitration agreement, made after the other party accepted the agreement, "was at most a request to modify the contract"). Either way, it does not undermine the validity of the agreement previously entered. *Podany v. Erickson*, 49 N.W.2d 193, 194 (Minn. 1951) (stating that once an offer is accepted, "requested or suggested modifications of the offer will not preclude the formation of a contract where it clearly appears that the offer is positively accepted, regardless of whether the requests are granted").

In short, because there is no genuine dispute that Evanston (through its undisputed agent Suredge) agreed to pay Service Restoration in exchange for Service Restoration's agreement to reduce its invoice, a contract was formed. *Wright*, 378 F. Supp. 3d at 773; *Asia Pac. Indus. Corp.*, 380 F.3d at 385. And Evanston's failure to perform under the contract—that is, its undisputed refusal to pay the final dollar amount to Service Restoration its agent agreed to pay—constitutes a breach of that contract. *Lyon Fin. Servs., Inc. v. Ill. Paper & Copier Co.*, 848 N.W.2d 539, 543 (Minn. 2014) ("A breach of contract is a failure, without legal excuse, to perform any promise that forms the whole or part of the contract."). Accordingly, the Court grants Service Restoration summary judgment on its breach-of-contract claim.

## CONCLUSION

Based on the foregoing, and on all of the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.    Service Restoration's Motion for Summary Judgment (ECF No. 34) is **GRANTED** in part and **DENIED** in part as follows:

      a.    Summary judgment is **DENIED** as to Service Restoration's promissory estoppel claim; and

      b.    Summary judgment is **GRANTED** as to Service Restoration's breach-of-contract claim.

2.    Evanston's Motion for Summary Judgment (ECF No. 40) is **GRANTED** in part and **DENIED** in part as follows:

      a.    Summary judgment is **GRANTED** as to Service Restoration's promissory estoppel claim, and the claim is **DISMISSED WITH PREJUDICE**; and

      b.    Summary judgment is **DENIED** as to Service Restoration's breach-of-contract claim.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Dated: November 19, 2025          *s/Laura M. Provinzino*
                              Laura M. Provinzino
                              United States District Judge